SANFORD L. MICHELMAN (SBN 179702)
smichelman@mrllp.com
MARC R. JACOBS (SBN 185924)
mjacobs@mrllp.com
JESSE J. CONTRERAS (SBN 190538)
jcontreras@mrllp.com
**MICHELMAN & ROBINSON, LLP**
10880 Wilshire Boulevard, 19th Floor
Los Angeles, CA  90024
Telephone:   (310) 299-5500
Facsimile:    (310) 299-5600

MONA Z. HANNA (SBN 131439)
mhanna@mrllp.com
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, Suite 1000
Irvine, CA 92614
Telephone:   (714) 557-7990
Facsimile:    (714) 557-7991

Attorneys for Plaintiff
CHANGE LENDING, LLC.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANGE LENDING, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY, COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS FUND,<br><br>    Defendant. | Case No.:  8:23-cv-01626<br><br>**ORIGINAL COMPLAINT FOR: DECLARATORY JUDGMENT**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff CHANGE LENDING, LLC, ("Change" or "Plaintiff") hereby alleges, by the undersigned attorneys, upon personal information as to itself, and upon information and belief as to all other allegations, as follows:

## NATURE OF THE ACTION

1. Change brings this action for a declaratory judgment, temporary restraining order, and preliminary and permanent injunction pursuant to 28 U.S.C. §§ 2201 and 2202, requesting relief from Defendant's arbitrary and capricious decertification of Change's CDFI status.

2. Change is committed to empowering all Americans to pursue the American Dream by providing fair and equal access to the necessary financial services. Change removes barriers that prevent underserved borrowers from achieving the American Dream of homeownership. Change does this through leveling the playing field by providing access to fair and responsible lending through proprietary products, streamlined processes, and strategic partnerships with capital sources. To accomplish this, in 2018, Change was certified and is qualified as an eligible, certified Community Development Financial Institution ("CDFI"), as those terms are defined by 12 C.F.R. § 1805.200 *et seq*. Change's CDFI certification status allows Change to provide loans for underserved communities across the country to make homeownership a reality for diverse and underserved families.

3. Defendant, the United States Department of the Treasury's Community Development Financial Institutions Fund ("CDFI Fund" or "Defendant") is a component of the United States Department of the Treasury ("DOT"), an executive agency of the United States of America.

4. One of the mechanisms that allows Change to provide these life changing loans is through its certification as a CDFI through the CDFI Fund. Change and the CDFI Fund share many of the common interests outlined above and have worked together towards achieving them for over five years.

5. Since earning its CDFI certification from the CDFI Fund in 2018, Change has been able to provide *$6.8 billion* in lending to low-moderate income borrowers; *$1.3 billion* in lending to persistent poverty areas; and *$3.1 billion* in lending to First Time Homeowners.

6. Change is proud to be a CDFI lender, providing America's underserved borrowers access to billions of dollars to purchase a home and be part of the American dream. Change serves communities in 47 states with 40 branches and over 2,600 lending partners. As a CDFI Certified lender, Change is afforded, among other things, increased flexibility in underwriting to serve underbanked and low-income individuals, all enabling Change to assist historically underserved communities, and specifically, the Target Market's, Target Populations and Investment Areas specified in the CDFI program, as defined by 12 C.F.R. § 1805.104.

7. Indeed, over 60% of the borrowers who Change funds, are minorities, low-income individuals, and borrowers in low-income communities.

8. Change relies on the certification for the regulatory ability to assist these underserved, unbanked borrowers. The loss of regulatory flexibility that comes with the CDFI certification will severely and disproportionately impact these underserved communities.

9. On August 17, 2023, Change received notice from the Defendant that it was terminating Change's CDFI certification, effectively immediately, without any ability for review, discussion, or other process to challenge the decision.

10. The CDFI Fund's decision to terminate Change's certification is based on clear errors that make the decision arbitrary and capricious, including without limitation, literally basic mathematical, computational and tabulation *errors* it made (not Change), and other gross errors not reflected in the facts and documents before the Defendant. Without Change's CDFI certification, Change will be unable to provide these life changing loans. Because of the CDFI Fund's recent incorrect determinations, Change is imminently at risk of losing its certification—indeed, the

CDFI Fund has advised it has already terminated Change's certification effective August 17, 2023. This decertification would greatly hinder, if not fully terminate, Change's ability to fulfill loans it has already committed to and/or where funding is due and imminent, to fulfill loans where the applicant has already applied and received a rate lock, or the ability to continue providing necessary loans to underserved communities. The arbitrary and capricious determination by the CDFI Fund will also cause significant and irreparable harm to Change and to the relationships and partnerships Change has developed nationwide as part of the CDFI program.

11. A declaratory judgment and injunction are necessary at this time as a valid case or controversy exists between the parties for this Court to declare the rights and remedies of Change and the Fund with respect to the determination of Changes CDFI certification status. The CDFI Fund has issued a notice terminating Change's certification status, effectively *immediately*, without due process, based upon arbitrary and capricious grounds, and based on unsupported and incorrect findings and facts not before the CDFI Fund, leading to the erroneous conclusion that Change does not meet the qualification requirements for certification under 12 C.F.R. § 1805.200 *et seq*.

## THE PARTIES

12. Plaintiff is a state-licensed mortgage lender with its principal place of business located at 175 N Riverview Drive, Suite C, Anaheim, CA 92808. CA.

13. Defendant, United States Department of the Treasury, Community Development Financial Institutions Fund, is a component of the United States Department of Treasury, an executive agency of the United States of America. Defendant is located at 1500 Pennsylvania Avenue, NW, Washington, D.C. 20220. The CDFI Fund, which is an agency within the DOT, is collectively referred to hereinafter as "Defendant" or "CDFI Fund."

## JURISDICTION AND VENUE

14. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the Administrative Procedures Act, 5 U.S.C. § 701, *et seq*. This Court may provide injunctive relief and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Further, this Court is authorized to issue a declaratory judgment and injunction against Defendants under 5 U.S.C. § 702.

15. Venue is proper in this Court because a substantial part of the events giving rise to the claims herein occurred in this district. 28 U.S.C. § 1391(b)(2). Venue is further appropriate in this Court because Change's principal place of business is located within this judicial district. 28 U.S.C. § 1391(c).

## FACTUAL BACKGROUND

### The Certification Process

16. The CDFI Fund administers the CDFI Program to provide assistance to financial institutions that focus on serving low-income individuals, historically underserved demographic populations, and distressed communities through awards of technical assistance ("TA") and financial assistance ("FA"), including awards for the Health Food Financing Initiative ("HFFIFA"), in the form of loans, grants, equity investments, deposits, and capital reserves.

17. Applicants must receive CDFI certification from the CDFI Fund to receive benefits such as increased flexibility in underwriting and less stringent document requirements. This allows certified entities to assist historically underserved communities.

18. To become certified, the CDFI Fund requires, among other things, that an applicant direct at least sixty percent (60%) of its financial product activities to a Target Market.

19. A "Target Market" refers to one or more Investment Areas or Targeted Populations.

20. An "Investment Area" ("IA") is a geographically defined area designated at the census tract level by the CDFI Fund based on indicators of economic distress.

21. "Targeted Populations" may include one or more Low Income Targeted Populations ("LITPs") (defined based on income) or Other Targeted Populations ("OTPs") (an identifiable group of individuals in the organization's service area for which there exists a strong basis in evidence that the group lacks access to loans, equity investments, and/or financial services).

22. An LITP consists of individuals in a specific geographic area whose family income is not more than (a) for a metropolitan area, 80% of the area median family income; or (b) for a non-metropolitan area, the greater of 80% of the area median family income or 80% of the statewide non-metropolitan area median family income.

23. OTPs are populations in a specified geographic unit that are: African American, Hispanic, Native American, Native Alaskan, Native Hawaiian, other Pacific Islander (residing in Other Pacific Islands), or any other alternative demographic group that is approved by the Fund on a case-by-case basis.

24. In its certification application, an applicant must report its financing activity to the Target Market in the aggregate, based on loan originations that occurred within the respective fiscal and calendar year of the application period, to determine if it meets the 60% requirement, and describe the methodology it used to calculate those contribution percentages.

25. Investment Areas are the most easily and objectively verifiable Target Market. An institution only needs its borrowers' addresses in order to confirm its contribution to a Target Market comprised of one or more Investment Areas. This is a simple two-step process. First, using publicly available Census data, each borrower's address (city, state, and ZIP code) is matched with the corresponding 11-digit Federal Information Processing System ("FIPS") code that uniquely identifies

the census tract in which the borrower is located.[1] Second, the FIPS codes are compared to the CDFI Fund's eligibility data in order to confirm whether each FIPS codes is qualified as an Investment Area.

26. On the other hand, the process of confirming an institution's contribution toward a Target Market consisting of one or more LITPs is a far more complicated process because the LITP definition requires knowledge of each borrower's total family income and family status to determine low-income status.

27. Financial institutions collect the minimum amount of information needed to underwrite different types of loans, and only rarely collect enough information to know a borrower's total family income and family size. As a result, institutions must use alternative methodologies to classify LITP loans.

## Change's Certification

28. In 2018, Defendant granted Change's Certification Application (defined herein) and certified Change as a CDFI.

29. One of the many benefits of Change's CDFI certification status is, and has been, increased flexibility in underwriting, increased flexibility in disclosure requirements, and other flexibility factors that benefit underserved borrowers, all enabling Change to assist historically underserved communities.

30. Since receiving its certification in 2018, Change has been able to provide approximately *$6.8 billion* in lending to low-moderate income borrowers; *$1.3 billion* in lending to persistent poverty areas; and *$3.1 billion* in lending to First Time Homeowners.

## CDFI Fund's Reviews of Change

31. From time to time, as part of the CDFI Fund's regular practices, the CDFI Fund reviews a CDFI's certification status. This may include, upon request,

---

[1] Each census tract in the United States is uniquely identified by a FIPS code. Each 11-digit FIPS code is a combination of – reading from left to right – the 2-digit state code, the 3-digit county code, and the 6-digit tract code for that particular census tract.

that a CDFI provide information and documentation to the CDFI Fund as is necessary for the CDFI Fund to undertake such a review. As might be expected by any and all CDFIs, Change has been routinely reviewed by the CDFI Fund.

32. In fact, from December 2021 until April 2023, Change has actively participated in meetings with and provided documentation and data to the CDFI Fund as normally requested. Each request has been fulfilled in a complete and timely manner.

33. Upon review of Change's 2020 and 2021 data, the CDFI Fund found Change's 2020 data inconclusive, ultimately stating it was unable to support a finding that Change failed to meet the 60% requirement in 2020. The CDFI Fund then requested Change's 2023 data as a "cure," despite the fact the CDFI Fund readily admitted there was no evidence of a default. Nonetheless, given Change has always been compliant, it promptly provided this information.

### The Fund's Decision to Revoke Change's Certification

34. Change reported that 71% of the number of transactions and 62% of the dollar amount transactions were qualifying loans. Indeed, the documentation and/or data supports this finding reported to the CDFI Fund.

35. Yet, on August 17, 2023, the CDFI Fund unexpectedly, without adequate notice or an opportunity to appeal the process, indeed without any due process at all, issued a letter to Change by *email* indicating that:

> "Since the CDFI Fund has determined that Change does not meet or exceed the 60 percent requirement in both number of transactions and dollar amount of transactions, Change's CDFI Certification status will be terminated as of the date of this notification."

36. The CDFI Fund alleged that while Change had exceeded the number of transactions requirement, with 66.42% of transactions qualifying, Change failed to meet the dollar requirement, with only 57.78% of total dollar amount qualifying. Change believes this is inconsistent with the documents provided and is factually incorrect.

36. The CDFI Fund's August 17 email indicated that the termination of Change's Certification status will be made effective immediately, as of the date of the email notification, disrupting both current and future loans, harming borrowers, and harming Change's business.

37. The CDFI Fund's stated rationales for the August 17 Notice are unsupported by the information, documents, and data provided by Change, but despite Change's best efforts to explain the anomalies, the CDFI Fund continues to move forward with decertification.

38. The CDFI Fund's first rationale for decertification is that "Loans tagged as 'LITP' for 'Qualifying Target Market' data field have a share of income adjusted for family size greater than 80 percent when Change's 'Annual Family Income' data field was divided by Change's 'MFIAdjustedforFamilySize' data filed." The specific "LITP" loans CDFI is referencing are loans provided to a "low-income target population." A low-income borrower is a borrower that earned only 80% of the median family income, which is then further adjusted to reflect the borrower's family side. When performing the calculation to make the above determination, the CDFI Fund mistakenly applied the 80% factor, despite the fact the documents provided by Change already reflected this calculation. This duplicative application of the 80% factor was therefore using 64% as the standard, rather than the proper 80% standard. In sum, the CDFI Fund inaccurately stated that 73 loans that Change correctly identified as LITP did not satisfy the pertinent definition of a low-income borrower. The CDFI Fund's finding is based on a clear and demonstratable mathematical error by the CDFI Fund (not Change), as Change attempted to explain to the CDFI Fund, as set forth above.

39. The CDFI Fund's second rationale for decertification is that "Loans categorized as 'Hispanic' for the 'Qualifying Target Market' data field that have conflicting information in their 'BorrowerEthnicity,' 'Borrower2Ethnicity,' 'Borrower3Ethnicity,' 'CoBorrowerEthnicity,' CoBorrower2Ethnicity,' and/or

'CoBorrower3Ethnicity' data fields." The 19 loans specifically impacted by this finding are to underserved populations, otherwise known as OTPs. Similar to the misunderstanding outlined above, CDFI Fund simply misreads Change's methodology in identifying borrower information by assuming the data for "BorrowerEthnicity" and "Borrower2Ethnicity" must be the same for co-borrower, when in fact, the data represents two distinct individuals of different ethnicity.

40. The CDFI Fund's third rationale for decertification is that "Loans tagged as 'IA' for the 'Qualifying Target Market' data filed are located in (1) states for which Change does not have an approved IA TM; (2) census tracts that do not qualify as IAs according to CDFI Fund's publicly available list of IAs; and (3) census tracts that do not exist on CDFI Fund's publicly available 2016-2020 ACS list of census tracts." The 96 loans impacted by this finding service individuals in historically low-income geographical areas. In disqualifying these loans, the CDFI disregarded both the definition of Invest Area in the Code of Federal Regulations at 12 C.F.R. §1805.201(b)(3)(ii) and the CDFI Fund's own publicly available FAQ information. If the CDFI Fund were to accurately apply these guidelines, these 96 loans would be considered qualifying loans, rather than excluded, which artificially and erroneously lowered the quantity and dollar amount of loans that were applied to the necessary 60% threshold.

41. With the CDFI Fund's erroneous exclusion of these loans from Change's loan portfolio, it concluded that Change falls below the necessary 60% threshold, disqualifying Change from receiving CDFI certification.

42. As outlined above, exclusion of these loans is based on clearly demonstratable and resolvable errors made by the CDFI Fund (not Change). As such, these decisions are arbitrary and capricious.

**Loss of Certification Will Cause Irreparable Injury to Borrowers**

43. As a result of this immediate change in status, loans that are already being processed can no longer be processed or considered CDFI loans. Therefore,

borrowers will lose their access to the loans granted by Change, thus losing their ability to make down payments and purchase homes that they have already obtained loan approval for.

44. As a result, borrowers will lose their deposits, right to enforce agreements to purchase, and right to locked in loan rates in an interest-rate increasing environment. These losses could prevent a borrower from purchasing their decided upon and dream home, potentially impacting the borrowers escrow arrangements and commitments already made in reliance on the approved CDFI loans. Even if borrowers are eligible for loans under traditional lending criteria, they will not be on the same rates and terms as CDFI loans already applied for and/or agreed to.

45. The impact is not limited to just those who are waiting to receive their loans. Borrowers with current loans through the program will likewise be impacted. For example, borrowers will no longer be under the community boards oversight for servicing the loans.

46. Of particular concern, especially given Change's mission to serve underbanked and low-income individuals, and underserved communities, is that the CDFI Fund's decertification of Change will disproportionately impact these low-income and traditionally underserved communities from obtaining these life changing loans. The impact and importance of these loans is evidenced by individuals' testimonials about Change:

> "We had talked to three lenders. All said that we had no options for a loan with the bankruptcy we had. We also had a private note we needed to pay off with a very high interest rate. Your Community Mortgage loan was our only option, and we are so thankful it was available."
> - Robert & Kelly C.

> "We paid off our home and had no more liquid cash available to gift my son. Thanks to this Community Mortgage program, we can take cash out for my son to have money for a down payment. Otherwise, we wouldn't be able to help him move out with his own family. We are very happy with Change."
> -Zhao & Xiao Ling Y.

"I just wanted to thank Change again for ALL you did for me during my cash-out refi! Nearly 10 years of darkness is now behind me – finally – because of Change. . . . I tried for so long to get a refi done, or even get approved for some sort of financial assistance. I was treated so poorly by so many other lenders in the past. But each and every single one of you at Change has been absolutely amazing! I felt listened to, like you really were working for me, and the end result is something I'll never be able to thank you enough for. THANK YOU ALL, from the bottom of my heart for everything you did."
-Lisa Ann B.

*See* https://www.thechangecompany.com/.

### Loss of Certification Will Cause Irreparable Harm to Change

47. In addition to the harm that borrowers will suffer, Change is imminently at risk of severe harm in the near term, and will suffer harm in the long term, as well.

48. As an initial matter, the economic realities of Change's business rely on Change's CDFI certification. Without it, many of Change's branches in traditionally underserved communities will be at risk of closure. These branches rely on Change's ability to operate in its current manner with certification. This will have a substantial detrimental impact on Change's nationwide network of CDFI partners, foreclosing those relationships.

49. Further, if permitted to arbitrarily revoke Change's certificate, Defendant will irreparably hinder Change's ability to operate and achieve the Parties' shared goals.

### FIRST CAUSE OF ACTION
### (Declaratory Judgment)

50. Change re-alleges and incorporates paragraphs 1–48 of this Complaint as fully set forth herein.

51. As set forth above, a valid case or controversy exists at this time for this Court to declare the rights and remedies of Change and Defendant with respect to Change's aforementioned CDFI certification.

52. The acts of Defendant as set forth above and below constitute an arbitrary and capricious revocation of Change's certification in violation of the Administrative Procedures Act, 5 USC § 701, *et seq*., and Change has been damaged and will continue to be damaged in the future by Defendants acts. Change's borrowers are further significantly harmed by the Defendant's arbitrary and capricious erroneous determination.

53. The CDFI Fund has issued a notice to Change terminating Change's certification.

54. Change meets the target market eligibility requirements to receive CDFI Certification.

55. The CDFI Fund's termination is based solely on erroneous understandings of Change's data, information, and documents provided to the CDFI Fund.

56. Therefore, the Fund's termination is arbitrary and capricious and must be enjoined.

57. For these reasons and pursuant to 28 U.S.C. §§ 2201 and 2202, Change requests that the Court enter a judgment declaring as follows:

    i. Change met the target eligibility requirements for CDFI Certification;

    ii. A declaratory judgment that the Fund wrongfully terminated Change's Certification;

    iii. A declaratory judgment that Change is eligible to receive CDFI Certification;

    iv. Immediate reinstatement of Change's CDFI Certification;

58. A temporary restraining order, preliminary and permanent injunction prohibiting Defendants from improperly decertifying Change;

59. Injunctive relief requiring Defendants to abide by all statutory requirements in all future engagements with Change.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff request judgement against Defendant as follows, and A declaratory judgment that:

1. Change met the target eligibility requirements for CDFI Certification;
2. A declaratory judgment that the Fund wrongfully terminated the Change's Certification;
3. A declaratory judgment that Change is eligible to receive CDFI Certification;
4. Immediate reinstatement of Change's CDFI Certification;
5. A temporary restraining order, preliminary and permanent injunction prohibiting Defendants from improperly decertifying Change;
6. Injunctive relief requiring Defendants to abide by all statutory requirements in all future engagements with Change;
7. Costs of suit herein;
8. Any other relief legal and equitable relief that may be requested herein or that this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable.

Dated: August 30, 2023   **MICHELMAN & ROBINSON, LLP**

By:  /s/ *Marc R. Jacobs*
Sanford L. Michelman
Mona Z. Hanna
Marc R. Jacobs
Jesse J. Contreras
Attorneys for Plaintiff
Change Lending, LLC