SANFORD L. MICHELMAN (SBN 179702)
smichelman@mrllp.com
MARC R. JACOBS (SBN 185924)
mjacobs@mrllp.com
JESSE J. CONTRERAS (SBN 190538)
jcontreras@mrllp.com
**MICHELMAN & ROBINSON, LLP**
10880 Wilshire Boulevard, 19th Floor
Los Angeles, CA 90024
Telephone: (310) 299-5500
Facsimile: (310) 201-2110

MONA Z. HANNA (SBN 131439)
mhanna@mrllp.com
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, Suite 1000
Irvine, CA 92614
Telephone: (714) 557-7990
Facsimile: (714) 557-7991

*Attorneys for Plaintiff*
CHANGE LENDING, LLC

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

CHANGE LENDING, LLC,

Plaintiff,

v.

UNITED STATES DEPARTMENT OF TREASURY, COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS FUND,

Defendant.

Case No.: 8:23-cv-01626

**PLAINTIFF CHANGE LENDING, LLC'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM OF POINTS AND AUTHORITIES**

*[Filed concurrently herewith: (1) Plaintiff's Complaint; (2) Declaration of Thedora Nickel; and (3)Declaration of Marc R. Jacobs [Proposed] Temporary Restraining Order and Order to Show Cause]*

Plaintiff, CHANGE LENDING, LLC ("Change Lending"), hereby applies *ex parte* to the Court pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65-1 for a Temporary Restraining Order enjoining Defendant UNITED STATES DEPARTMENT OF TREASURY, COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS FUND ("CDFI Fund") and all of its representative agents, employees, or attorneys from implementing or enforcing its determination to decertify Change Lending as a Community Development Financial Institution as set forth in its notice of decertification dated August 17, 2023.

Change Lending has satisfied the requirements to bring this Application. As required by Local Rule 7-19, the name, address, telephone number and e-mail address of counsel for the opposing party are as follows:

| | |
|---|---|
| Ms. Michelle Dickens<br>OCPE Manager<br>U.S. Department of the Treasury<br>1500 Pennsylvania Avenue, NW<br>Washington, DC 20220<br>Email: dickensm@cdfi.treas.gov | Mr. Dietrich Douglas<br>Legal Counsel<br>U.S. Department of the Treasury<br>1500 Pennsylvania Avenue, NW<br>Washington, DC 20220<br>Email: douglasd@cdfi.treas.gov |
| Ms. Shannon Mckay<br>Program Manager, Financial Strategies & Research, CDFI Fund<br>U.S. Department of the Treasury<br>1500 Pennsylvania Avenue, NW<br>Washington, DC 20220<br>Email: McKayS@cdfi.treas.gov | |

Further, pursuant to L.R. 7-19.1, Change Lending's counsel, Marc Jacobs, has advised the above identified persons via email correspondence of the timing and substance of this *ex parte* application and the relief requested. Declaration of Marc Jacobs in Support of Ex Parte Application ("Jacobs Declaration"), ¶ 2-3. A true and correct copy of this notice is attached as **Exhibit 33** to the Jacobs Declaration.

This Application is made on the grounds set forth in the accompanying Memorandum of Support; the Declarations of Steven Sugarman and Marc Jacobs and the exhibits attached thereto; all pleadings and papers filed in this action; the argument of parties and/or their

counsel; and further evidence as the Court may consider at or before a hearing regarding this Application or the hearing regarding the Order to Show Cause and preliminary injunction requested herein.

Dated: August 30, 2023 **MICHELMAN & ROBINSON, LLP**

By: /s/ *Marc R. Jacobs*
Sanford L. Michelman, Esq.
Mona Z. Hanna, Esq.
Marc R. Jacobs, Esq.
Jesse J. Contreras, Esq.
Attorneys for Plaintiff
CHANGE LENDING, LLC

# TABLE OF CONTENTS


I. INTRODUCTION. .......... 1

II. FACTUAL BACKGROUND. .......... 5

A. The Department of Treasury's CDFI Fund. .......... 5

B. Certification Under the CDFI Program. .......... 6

C. Change Has *Always* Provided CDFI Home Loans to Underserviced Communities. .......... 7

D. Defendant Arbitrarily Revokes Change's CDFI Certification. .......... 8

1. Defendant Removed Over $30 Million in Loans from Change's Target Market Calculations Based on a Math Error. .......... 9

2. Defendant Removed Over $7.4 Million in Loans from Change's Target Market Calculations Based on Non-Existent Discrepancies in Ethnicity .......... 11

3. Defendant's Removal of Over $25 Million in Loans from Change's Target Market Calculations was Based on Compounded Errors .......... 12

a) Defendant Removed Over $15 Million in Loans from Change's Target Market Calculations of LITP Borrowers. .......... 12

b) Defendant Removed Over $25 Million in Loans in Contradiction of its Own Guidance on IA Loans .......... 13

E. Defendant's Arbitrary Decertification Displaces Hundreds of Home Loans Valued in Excess of $500 Million. .......... 14

III. ARGUMENT. .......... 15

A. Plaintiff is Likely to Succeed on the Merits. .......... 16

B. Plaintiff and Its Customers Will Suffer Irreparable Harm. .......... 17

C. The Balance of Equities Tips in Plaintiff's Favor and is in the Public Interest. 19

IV. A BOND SHOULD NOT BE REQUIRED. .......... 20

V. CONCLUSION. .......... 21

# TABLE OF AUTHORITIES


Page(s)

**Federal Cases**

*Am. Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470 (9th Cir. 1985) ....17

*Federal Deposit Insurance Corporation v. Meyer*, 510 U.S. 471 (1994)....2

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) ....20

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ....19

*Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)....16

*Nken v. Holder*, 556 U.S. 418 (2009)....19

*Northern Spotted Owl v. Hodel*, 716 F. Supp. 479 (W.D. Wash. 1988) ....16

*Pom Wonderful LLC v. Hubbard*, 775 F. 3d 1118 (9th Cir. 2014) ....15

*Sato v. U.S. Bank Tr. NA*, 2014 WL 12571041 (C.D. Cal. Jan. 21, 2014)....17

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020)....2

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)....19

**Federal Statutes**

5 U.S.C.
§ 702 ..... 2
§ 706(2)(a) ..... 4, 16

15 USC
§ 1639c ..... 14
§ 1640 ..... 14

§ 1805.201(b)(3) ..... 6

**California Statutes**

Administrative Procedures Act ..... 2, 16

**Other Authorities**

12 Code of Federal Regulations.

§ 1805 ..... 3, 6, 10, 13
§1026.43 ..... 14

Federal Rules of Civl Procedure 65 ..... 2, 20

United State Code

§ 706(1) ..... 16
§ 1805.201(b)(3) ..... 6

United States Constitution

5th Amendment ..... 17

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION.

Plaintiff Change Lending, LLC ("Change") has been a Community Development Financial Institution ("CDFI") since 2018 and primarily provides home loans to low-income and traditionally underserved communities throughout the United States. On August 17, 2023, the Department of Treasury's Community Development Financial Institutions Fund ("Defendant" or "CDFI Fund") ***terminated*** Change's CDFI certification in error, ***without warning***. Change identified several clear and undeniable errors in the CDFI's calculations and notified the CDFI Fund of the errors immediately. The CDFI Fund has offered ***Change no meaningful opportunity*** to demonstrate to the Defendant that it made a mistake; instead, the CDFI Fund has dodged emails, phone calls and letters. The CDFI Fund has stated it is "reviewing" the situation and promised to meet with Change but has not done so. Meanwhile, Change and its borrowers are facing irreparable harm and the harm has become imminent.

While Change has worked tirelessly to try and minimize the impact to its borrowers, Defendant's updated list of certified CDFIs published on August 22, 2023, which listed an "As Of" date of August 15, 2023, did not include Change as a certified CDFI. Not only is the August 15 date at odds with the notice of decertification sent to Change on August 17, 2023, this publication has resulted in CDFI's lenders freezing their accounts for these programs until the certification issue is resolved. As a consequence of Defendant's arbitrary and capricious termination of Change's certification, Change will be unable fund approximately ***700 home loans*** through October 2023 that were underwritten as non-QM[1] loans worth over ***$550 million*** to largely low-income and minority borrowers. The vast majority of these loans are home purchase loans by the nation's most vulnerable borrowers who will be unable to fund their home purchase, subjecting them to the risk of losing their deposits and being unable to enforce their purchase agreements. Stated another way, these borrowers put down their life

[1] A Non-QM loan, or a non-qualified mortgage, is a type of mortgage loan that allows you to qualify based on alternative methods, instead of the traditional income verification. Half of Change's Non-QM loan inventory is impacted by the decertification. Nickel Decl. ¶ 58.

savings as a deposit, and now may be financially wiped out. Approximately ***100 loans*** worth approximately ***$50 million*** are scheduled to close ***in the next two weeks***. Nickel Decl., ¶ 57. This places these borrowers at risk of losing millions of dollars in earnest money deposits put up to secure the purchase transactions. Failure to fund these loans will result in irreparable harm to Change's borrowers and Change's goodwill. This situation is precisely what the issuance of a temporary restraining order was designed for; namely, maintain the *status quo* while issues are being resolved.

Pursuant to FRCP 65(b), Change applies *ex parte* for a temporary restraining order enjoining implementation of the CDFI Fund's decertification determination pending a review of Change's response to Defendant's August 17, 2023 notice of decertification ("Decertification Notice"), and this Court's judicial review of the arbitrary and capricious determination made in error by the CDFI Fund. If the Court does not enjoin the decertification and maintain the *status quo* pending a full hearing or trial on this matter, *hundreds* of borrowers, the majority of whom are minority and low-income economically marginalized individuals, will be unable to timely complete home purchase transactions and could lose their life savings. Further, ]Change will suffer irreparable harm by the loss of business that will inevitably occur before this Court is able to make a decision on the merits. Change will be unable to seek monetary damages under the APA for any unlawful agency action and reputation, *see,* 5 U.S.C. § 702 (providing for "[a]n action in a court of the United States seeking relief other than money damages"), thus there is no avenue of legal recourse for Change. *See, Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, 485 F. Supp. 3d 1, 59 (D.D.C. 2020) (explaining that "injuries are unrecoverable because the present suit arises under the APA, which does not allow for money damages"); *see also Federal Deposit Insurance Corporation v. Meyer*, 510 U.S. 471, 475 (1994).

Thus, absent a TRO maintaining the *status quo*, even should this Court agree (as Change expects it will) that the CDFI Fund's determination was erroneous, arbitrary and capricious, it will be too late to stop the irreparable harm to these borrowers, not to mention to Change's own business. Defendant's erroneous termination of Change's certification can

be easily corrected in the next sixty (60) days to avoid irreparable harm to Change's borrowers. Conversely, there is literally no harm to the Defendant by the issuance of this requested TRO, since the CDFI Fund has already agreed to review the situation; the immanent harms arises from CDFI's failure to clearly state its intent to toll any final decision pending completion of its review. As such, the TRO should issue.

By way of background, Change is a CDFI lender, providing America's underserved borrowers access to billions of dollars of capital. Change serves communities in 47 states with 40 branches and over 2,600 lending partners, servicing and providing loans to economically disadvantaged communities, injecting capital into neighborhoods that lack access to financing, and to low-income, minority and socially-economically diverse marginalized borrowers. Change's mission is to expand economic opportunity for underserved people and communities by participating in a national network of community development lenders, investors, and financial service providers, which is why Change applied for, and obtained its CDFI Certification from the CDFI Fund in 2018. Since then, Change has provided *$6.8 billion* in lending to low-moderate income borrowers; *$1.3 billion* in lending to persistent poverty areas; and *$3.1 billion* in lending to First Time Homeowners, squarely fulfilling the mission of both Change *and* the CDFI Fund, to ensure that all people and communities have access to the investment capital and financial services they need to prosper, expanding economic opportunity for underserved people and communities. Nickel Decl., ¶ 2. The CDFI Fund was created for this very purpose.

Pursuant to 12 C.F.R. § 1805.201(c), Defendant is authorized to review a CDFI's certification status from time to time, to ensure that it meets the certification requirements. Defendant has routinely reviewed Change's certification, as with other CDFIs. Change cooperated with the CDFI Fund and provided, upon request, all information and documentation requested for review. Nickel Decl., ¶ 7. The documentation and information provided to the CDFI Fund was clear: Change meets, has continued to meet, and has always met the certification requirements of 12 C.F.R. § 1805.201. *Id*.

However, on August 17, 2023, Defendant unexpectedly, and without warning,

notified Change that its review of Change's data indicated that Change made 67% of its loans to Target Market borrowers but only 57-58% of its loans by dollar amount to Target Market borrowers. This resulted from the CDFI rejecting loans that had been designated as Target Market loans by Change. Based on its methodology, the CDFI Fund issued a Decertification Notice stating that, "Since the CDFI Fund has determined that Change does not meet or exceed the 60 percent requirement in both number of transactions and dollar amount of transactions, Change's CDFI Certification status will be terminated as of the date of this notification." Nickel Decl., ¶ 27.

Defendant's determination was based on excluding over 180 loans worth in excess of $63 million that qualified as Target Market loans. It was immediately apparent that Defendant excluded these loans because it made clear and undeniable errors in reviewing Change's submission. For example, Defendant excluded over $30 million worth of loans based on a verifiable math error in that it determined the low-income threshold (which is 80% of Median Family Income, adjusted by family size) by multiplying Median Family Income by 80% ***two times***, resulting in 64% of Median Family Income, thereby reducing the income threshold for loans to low-income borrowers. Defendant also excluded over $7 million worth of loans based on concluding that the Change submission contained "conflicting" ethnic data for borrowers, but failed to realize that certain loans have borrowers of more than one ethnicity and, as such, there would be borrowers with multiple ethnicities on the application. Finally, the Fund rejected over $12 million in loans from borrowers that are low income as documented and verified by tax transcripts. The CDFI Fund did this without any justification. These erroneous determinations were arbitrary and capricious under 5 U.S.C. § 706(2)(a), as Defendant failed to consider all relevant factors, offered an explanation that runs counter to the evidence before it, and failed to articulate a rational connection between the facts found and the choice made. A TRO is necessary so that Change can walk the Defendant through its errors and save these borrowers from losing their deposits, while causing literally no harm, damage, or inconvenience to the Defendant. Consequently, the balance of equities weighs heavily in favor of issuing the TRO.

Change requests that the Court issue the TRO and set a preliminary injunction hearing in approximately 60 days to allow the parties to resolve the simple auditing issues. The CDFI Fund's refusal to meet or respond to Change, while simultaneously telling Change it was reviewing the situation, suggests all parties will benefit from additional time. It is likely this dispute can be resolved within this time frame, which would allow the preliminary injunction hearing to be taken off calendar and avoid burdening this Court, all while protecting Change's borrowers and allowing them to proceed with their already negotiated loan transactions in an orderly fashion. If not, Change will be prepared to demonstrate at a preliminary injunction hearing that the injunction should continue pending trial based on its strong likelihood of success on the merits, since Defendant's arbitrary and capricious decertification decision was based on erroneous determinations that have no support in the record Defendant reviewed and Change can easily demonstrate it meets all CDFI requirements.

## II. FACTUAL BACKGROUND.

### A. The Department of Treasury's CDFI Fund.

The CDFI Fund was created for the purpose of promoting economic revitalization and community development through investment in and assistance to Community Development Financial Institutions (CDFIs). The CDFI Fund achieves its purpose by promoting access to capital and local economic growth in the following ways:

- Through its CDFI Program by directly investing in, supporting and training CDFIs that provide loans, investments, financial services and technical assistance to underserved populations and communities;
- Through its New Markets Tax Credit Program by providing an allocation of tax credits to Community Development Entities, enabling them to attract investment from the private-sector and reinvest these amounts in low-income communities;
- Through its Native Initiatives, by taking action to provide financial assistance, technical assistance, and training to Native CDFIs and other Native entities proposing to become or create Native CDFIs;

- Through its CDFI Bond Guarantee Program by issuing bonds to support CDFIs that make investments for eligible community or economic development purposes;
- Through its Capital Magnet Fund, which offers competitively awarded grants to finance affordable housing solutions for low-income people / communities.

Providing access to affordable financial products and services in underserved communities is a vital part of the CDFI Fund's mission.

**B. <u>Certification Under the CDFI Program.</u>**

Certification as a CDFI allows an organization to receive benefits such as increased flexibility in underwriting. This allows certified entities like Change to better and more flexibly assist historically underserved communities. Attaining CDFI Certification is the U.S. Department of the Treasury's recognition of specialized financial institutions serving low-income communities. To become certified under the CDFI program, there is a certification process under 12 C.F.R. § 1805.201. The CDFI Fund supports financial institutions that serve low-income and historically underserved individuals and communities. Institutions seeking support from the CDFI Fund must apply for and receive CDFI certification to become eligible. 12 C.F.R. § 1805.200(a). To become certified, an institution must, among other regulatory criteria, serve a "Target Market."[2] *Id.* § 1805.201(b)(3). An applicant may show that it serves a Target Market by demonstrating in its application that it provides financial products or services to at least one (a) "Investment Area,"[3] or (b) "Targeted Population."[4] *Id.* § 1805.201(b)(3)(i).

To become certified, the CDFI Fund requires, among other things, that an applicant direct at least 60% of its financial product activities to a Target Market. There are two ways

---

[2] Target Market means an Investment Area(s) and/or a Targeted Population(s). *See*, 12 C.F.R. § 1805.104.

[3] An "Investment Area" is a geographically defined area designated by the CDFI Fund. See, § 1805.201(b)(3); 12 C.F.R. § 1805.104.

[4] Targeted Population means individuals or an identifiable group of individuals meeting the requirements of § 1805.201(b)(3). *See*, 12 C.F.R. § 1805.104.

for a CDFI institution to show they meet the 60% requirement. The first is by demonstrating at least 60% of financial product activities are directed to borrowers residing in "Investment Areas," which are geographically defined areas designated by the CDFI Fund based on indicators of economic distress. The second is by demonstrating that at least 60% of financial product activities are directed to one or more "Targeted Populations," which may include one or more Low Income Targeted Populations ("LITPs") (based on income) or Other Targeted Populations ("OTPs") (persons in a historically disadvantaged ethnic group).

In its certification application, an applicant must report its financing activity to the Target Market in the aggregate, based on loan originations within the application period, to determine if it meets the 60% requirement, and describe the methodology it used to calculate same.

Investment Areas are one type of Target Market. To verify placement in an Investment Area, an institution uses its borrowers' addresses in order to confirm its contribution to a Target Market comprised of one or more Investment Areas.

The process of confirming an institution's contribution toward a Target Market consisting of one or more LITPs is a complicated process because the LITP definition requires knowledge of each borrower's total family income and family status to determine low-income status.

Financial institutions collect the minimum information necessary to underwrite different types of loans. As a result, institutions must use alternative methodologies to classify LITP loans.

### C. **<u>Change Has *Always* Provided CDFI Home Loans to Underserviced Communities.</u>**

In 2018, Defendant granted Change's Certification Application and certified Change as a CDFI. Nickel Decl., ¶ 2. In FYs 2018–2023, year to date, Change has been able to provide $6.8 billion in lending to low-moderate income borrowers; $1.3 billion in lending to persistent poverty areas; and $3.1 billion in lending to First Time Homeowners. *Id*.

Change serves communities in 47 states with 40 branches and over 2,600 lending partners. Nickel Decl., ¶ 4. Change offers traditional and non-traditional loans as diverse as the borrowers it serves. As a long-time certified CDFI, Change has been serving borrowers of all communities to ensure they have access to the investment capital and financial services they need to prosper. Change's mission is to expand economic opportunity for underserved people and communities by participating in a national network of community development lenders, investors, and financial service providers. Nickel Decl., ¶ 2.

Change removes barriers that prevent underserved borrowers from achieving the American Dream of homeownership. Change does this by providing access to fair and responsible lending through proprietary products, streamlined processes, and strategic partnerships with capital sources. This allows Change to provide loans for underserved communities across the country. Nickel Decl., ¶ 3. As a CDFI Certified lender, Change is afforded increased flexibility in underwriting, allowing it to assist historically underserved communities. *Id*. These loans change the lives of the underbanked and low-income that Change serves.

**D. <u>Defendant Arbitrarily Revokes Change's CDFI Certification.</u>**

Defendant issued the Decertification Notice on August 17, 2023. Exh. 16. Therein, Defendant concluded that Change failed to meet or exceed the 60% target market threshold necessary for certification as a CDFI. *Id.* at pg. 2. Specifically, Defendant determined Change reached 66.42% in terms of loan count but only 57.78% in dollar amount. *Id*. The Decertification Notice was based on Defendant's analysis of 2023 year-to-date data requested on March 29, 2023. Nickel Decl., ¶ 27. The Decertification Notice claimed the 2023 data had been requested to "cure the issue initially identified in the August 31, 2022, site visit report." But the Defendant disregarded its written admission on March 29, 2023 that its analysis of Change's 2020 data was inconclusive and that its review of 2021 data indicated Change was over 60% by both dollar amount and number of loans. Nickel Decl., ¶ 20. Defendant's 2022 "CDFI Certification Cure Related FAQs" states: "A Certified CDFI that is in a ***cure period*** in connection with the CDFI certification means that a Certified

CDFI ***has failed to demonstrate that it meets one or more CDFI Certification requirements***."[5] However, Defendant admitted it never found Change to not be compliant, which means there was never a "cure" period, and as such, Defendant violated its own guidance on when a cure period is even triggered.

Notwithstanding violating its own guidance, upon review of the 2023 data, Defendant claimed ***for the first time*** on August 17, that it had identified three categories of "anomalies" in Change's 2023 data supporting its finding that Change failed to meet its 60% target market threshold. Worse, in issuing the Decertification Notice, Defendant did not afford Change any opportunity to respond.[6] Instead, Change was shocked that the Decertification Notice was effective *immediately*. This was unfortunate, since ***none*** of the anomalies identified by Defendant are supported by the data provided by Change, but, in fact, demonstrate the opposite and that Change meets all the certification requirements and the Defendant simply made errors. Each of the alleged "anomalies" could have been easily explained had Defendant afforded Change any opportunity to respond.

***1. Defendant Removed Over $30 Million in Loans from Change's Target Market Calculations Based on a Math Error.***

Defendant removed 73 loans with a loan value of $30,413,981 from Change's target market calculations for the following reason:

> "Loans tagged as 'LITP' for 'Qualifying Target Market' data field have a share of income adjusted for family size greater than 80 percent when Change's 'Annual Family Income' data field was divided by Change's 'MFIAdjustedforFamilySize' data filed."

---

[5] https://www.cdfifund.gov/sites/cdfi/files/2022-09/CDFI_Certification_Cure_Frequently_Asked_Questions_2022.pdf

[6] Failing to afford Change any time to respond is particularly troubling given that Defendant apparently knew it intended to decertify by no later than August 15, 2023. This is demonstrated by Defendant's list of Certified CDFI published on August 22, 2023. Change was not on the list. Admittedly, the list itself identifies Certified CDFIs "as of August 15, 2023," but the Decertification Notice announced certification was terminated effective August 17, yet Defendant represents to the public that Change was decertified August 15, 2023. Nickel Decl., ¶ 32; Exh. 32. Defendant's failure to timely share its determination harmed both Change and its borrowers.

Defendant's reference to loans tagged as "LITP" means "low-income target population." This reflects that the CDFI program is intended to service low-income populations and that loans made to low-income borrowers can be used to establish that a CDFI's loan portfolio has met its 60% target threshold. Nickel Decl., ¶ 42. Here, Defendant claimed it identified 73 loans in Change's 2023 data tagged "LITP" that did not meet the definition of a low-income borrower (borrower who earned 80% of the median family income ("MFI"), adjusted by borrower's family size. 12 C.F.R. § 1805.104. Defendant excluded any loan where the value in the "Annual Family Income" field in the spreadsheet they were provided was more than 80% of the value found in the "MFIAdjustedforFamilySize" field. However the "MFI Adjusted for FamilySize" field was already clearly adjusted MFI by 80%. Therefore, the CDFI's additional 80% adjusted resulted in a calculation of 64% of MFI adjusted or family size.

It was plain error for Defendant to perform the calculation in this manner. As clearly reflected in the spreadsheet it was provided, the MFIAdjustedforFamilySize field (column AI) was a calculation field that multiplied the applicable census tract MFI (column AF) by 0.8 to reflect 80% of MFI (column AG) which was then adjusted by family size to derive MFIAdjustedforFamilySize (column AI). Nickel Decl., ¶ 43. In other words, ***Change's spreadsheet had already performed the 80% of MFI calculation*** and it was clear error for Defendant to apply the 80% factor to the 80%. What Defendant should have done was simply compare "Annual Family Income" against "MFIAdjustedforFamilySize" to make sure that the "Annual Family Income" value was the lower number. *Id*. Had it done so, it would have determined that all 74 of the loans it excluded qualified as LITP loans. By applying the 80% factor a second time, Defendant improperly changed the definition of a low-income borrower from one who earned 80% or less of MFI to one who earned 64% or less of MFI. This is a simple math error.

### 2. ***Defendant Removed Over $7.4 Million in Loans from Change's Target Market Calculations Based on Non-Existent Discrepancies in Ethnicity***

Defendant removed 19 loans with a loan value of $7,464,464 from Change's target market calculations for the following reason:

> "Loans categorized as 'Hispanic' for the 'Qualifying Target Market' data field that have conflicting information in their 'BorrowerEthnicity,' 'Borrower2Ethnicity,' 'Borrower3Ethnicity,' 'CoBorrowerEthnicity,' CoBorrower2Ethnicity,' and/or 'CoBorrower3Ethnicity' data fields."

The CDFI program is intended to assist underserviced target populations and loans made to an identified list of underserviced populations (identified as OTPs) can be used to establish that a CDFI's loan portfolio has met its 60% target threshold. One of the identified OTPs are borrowers who self-identify as "Hispanic" and a loan qualifies as an OTP target market loan if 50% or more of the borrowers on a loan self-identify as "Hispanic." Nickel Decl., ¶ 46. Here, Defendant disqualified the loan if there was any conflict between the ethnicity of the first borrower and the second borrower or co-borrower in the spreadsheet they were provided. For example, if "Borrower1Ethnicity" for a loan was reported as "Hispanic" but "Borrower2Ethnicity" for the same loan was reported as "White," Defendant disqualified the loan for exhibiting a conflict in the way borrower identified their ethnicity. Nickel Decl., ¶ 47.

Defendant's analysis simply ignores the fact that "BorrowerEthnicity" and "Borrower2Ethnicity" report the ethnicity of ***two distinct and separate borrowers***. Nickel Decl., ¶ 48. In other words, there can be no "conflict" between any of these fields, because every borrower is unique, and they are not required to all share the same ethnicity. CDFI loans sometimes have up to six different borrowers. Nickel Decl., ¶ 49. Depending on the relationship between borrowers they may fill out one or more applications in support of a loan. *Id*. Loans may be supported by up to three separate applications. *Id*. Every Borrower and CoBorrower listed on an application is a unique individual. *Id*. By identifying

"conflicts" between the ethnic identifications of the unique individuals depicted in the spreadsheet, Defendants exhibited a misunderstanding of the data they were reviewing. The CDFI Fund did not find any errors in the reporting or any issues in the methodology Change uses to designate the race/ethnicity of borrowers,. Rather, it appears they believed that Borrower1 and Borrower2 were the same person. This interpretation is not something Change could have envisioned. This mistake could have been easily identified and avoided if Defendant had afforded Change an opportunity to respond to the Decertification Notice.

***3. Defendant's Removal of Over $25 Million in Loans from Change's Target Market Calculations was Based on Compounded Errors***

Defendant removed 96 loans with a loan value of $25,235,022 from Change's target market calculations for the following reason:

> "Loans tagged as 'IA' for the 'Qualifying Target Market' data filed are located in (1) states for which Change does not have an approved IA TM; (2) census tracts that do not qualify as Ias according to CDFI Funds's publicly available list of Ias; and (3) census tracts that do not exist on CDFI Fund's publicly available 2016-2020 ACS list of census tracts."

This was erroneous for multiple reasons.

***a) Defendant Removed Over $15 Million in Loans from Change's Target Market Calculations of LITP Borrowers.***

Many of the loans Defendant excluded from the calculation qualified as Target Market loans for multiple reasons including that the borrower was a LITP. Nickel Decl., ¶ 56. In fact, the Defendant removed over $15 million of loans that Change has documented via tax transcripts were made to low-income borrowers. *Id*. Many of these loans were also in low-income communities. *Id*. For loans that qualified under multiple Target Market metrics, Change assigned the loan to a primary Target Market for purpose of reporting the total percentages without double counting these loans in multiple categories. *Id*. For instance, loans that were both LITP and IA qualifying were designated IA for the purposes of the calculation, but remained able to independently qualify based on LITP. *Id*. Change provided Defendant with columns that reflect each Target Market and whether each loan qualified under each target market so that the CDFI Fund had the data to know that certain

loans qualified in more than one Target Market. Defendant ignored this data or did not understand it. *Id*. However, Change reported how it designated a loan as a Target Market loan. Consequently, the CDFI Fund was aware of the fact these loans were LITP at the time they rejected the loans.

All LITP loans Defendant excluded as not qualifying as IA loans should be added back. These loans remain Target Market loans and the data provided to Defendant is complete to demonstrate how each loan also qualifies as LITP.

#### ***b) Defendant Removed Over $25 Million in Loans in Contradiction of its Own Guidance on IA Loans***

Defendant's reference to loans tagged as "IA" means "Investment Areas." (see 12 C.F.R. §1805.201(b)(3)(ii)). A CDFI Investment Area is defined as a geographic unit. Id. This reflects that the CDFI program is intended to assist borrowers purchasing homes or financing businesses in historically low-income geographical areas and that loans made to borrowers investing in these areas can be used to establish that a CDFI's loan portfolio has met its 60% target threshold.

On March 21, 2023, the CDFI Fund issued its 2016–2020 American Community Survey Data FAQs – CDFI Investment Area and Bank Enterprise Award Program Transition. Nickel Decl., ¶ 53; Exh. 17. In the FAQ, the CDFI stated that the definition of Persistent Poverty Counties (PPCs) (which satisfy the IA requirement that the IA "has a population poverty rate of at least 20%") was updated by Congress in December 2022. This law was applicable to 2023 originations by CDFIs and defined PPCs as follows: "any county, including county equivalent areas in Puerto Rico, that has had 20% or more of its population living in poverty over the past 30 years, as measured by [the Census]."

The CDFI Fund FAQ also informed the public that "***PPC transactions do not need to be located in their approved Target Market but must be in an Eligible Market and a PPC County***." Exh. 17, pg. 4.

The FAQ makes clear that Change was entitled to classify as Target Market loans all loans in Persistent Poverty Counties and that "PPC transactions do not need to be located in

[a CDFIs] approved Target Market but must be in an Eligible Market and a PPC County." *Id*. Therefore, it was inappropriate for the CDFI Fund to disqualify IA loans that are not approved in the ten states Change has received an IA Target Market certification to serve. In fact, the inclusion of these loans in Change's denominator rather than its numerator for calculating Target Market Percentage lowers Change's overall percentage and essentially punishes Change for lending to PPC and LITP nationally. Nickel Decl., ¶ 55. Instead, ***all*** loans to PPCs nationwide are able to be counted towards Change's Target Market numbers if they are located in an Eligible Market and a PPC County, ***which all 96 of the loans were***. *Id*. The CDFI Fund must follow its public guidance as contained in the FAQ. Change's methodology is consistent with the CDFI Fund's public FAQ and the definition of Investment Area; however, the Defendant's methodology is inconsistent with its own FAQ in the public guidance. Change believes its lending is over 60% in both categories even without the inclusion of these loans, but Defendants' decision to exclude IA loans based on inapplicable geographic restrictions was also erroneous.

**E. Defendant's Arbitrary Decertification Displaces Hundreds of Home Loans Valued in Excess of $500 Million.**

As a certified CDFI, Change is exempt from the Truth in Lending Act's Minimum Standards for Transactions Secured by a Dwelling. 12 CFR 1026.43(a)(3)(v)(A). This allows Change to use underwriting criteria that are less rigid than the underwriting requirements imposed by law on non-exempt loans. *See* 15 USC § 1639c; 12 CFR 1026.43(c).

Conversely, if a lender is not certified as a CDFI, it must comply with the ATR Requirement. Failure to comply subjects the lender to civil liability under 15 USC § 1640 and would violate standard provisions in Change's warehouse lending agreements and would make the loans impossible to sell, which deprives Change of any realistic way of facilitating the loan. Nickel Decl., ¶ 58.

If the TRO is not issued and Change's certification is terminated, Change can no longer fund the inventory of Non-QM loans it has already approved through October. Nickel Decl., ¶ 57. Collectively this is more than ***100 home purchase loans*** with a value exceeding

***$50 million in the next two weeks alone, and multiples of that over the next sixty days***. *Id*. These borrowers will lose their "locked" in pricing, their real estate deposits, and their dream homes. Change cannot presently fund these loans because many were approved using underwriting criteria that relied on Change's CDFI certification. *Id*. at ¶ 58. These loans can no longer proceed using the borrower existing underwriting and there is not enough time for the borrowers to change programs prior to their end of escrow. *Id*.

Even if Change simply disregarded the ATR Requirement (which it cannot), it no longer has the ability to fund these loans. Since Defendant advised Change it was reviewing the situation, Change believed the decertification was under review. Nickel Decl., ¶ 59. However, the uncertainty and lack of communication from the CDFI Fund, and actions, has caused Change funding sources to become nervous about funding these loans until Change gains clarity as to the status of the decertification. *Id*. In light of Defendant's failure to meet with Change in good faith to discuss the review they claim is ongoing and ***failure to confirm that Change's CDFI certification status is active pending the conclusion of that review***, Change had no choice but to suspend funding of all impacted loans on August 29, 2023, pending a TRO.

Even if these borrowers qualified for loans under traditional lending criteria, they will still be impacted because their loans will not be able to close pursuant to timetables dictated by in-place real estate agreements which likely will result in forfeited deposits and a loss of the borrower's ability to enforce their agreement to purchase. These borrowers stand to lose their down payments due to no fault of their own, but rather the Defendant failing to understand the data it was provided resulting in clear and indefensible errors.

## III. <u>ARGUMENT.</u>

A motion for a TRO or preliminary injunction requires the Court to make four findings as to Plaintiff: (1) likelihood of success on the merits; (2) likelihood of suffering irreparable harm in the absence of preliminary relief; (3) the balance of equities favors Plaintiff; and (4) and injunction is in the public interest. *Pom Wonderful LLC v. Hubbard*, 775 F. 3d 1118, 1124 (9th Cir. 2014). Here, all four conditions are met.

**A. Plaintiff is Likely to Succeed on the Merits.**

The Administrative Procedures Act ("APA") provides that any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" is prohibited and shall be overturned by the court. 5 U.S.C. § 706(2)(A). It also provides that the reviewing court shall compel agency action "unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

An agency decision is arbitrary and capricious if the agency has failed to consider all relevant factors, has "offered an explanation for its decision that runs counter to the evidence before the agency," or has not articulated "a rational connection between the facts found and the choice made." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The APA standard "does not shield the agency action from 'thorough, probing, in-depth review.'" *Northern Spotted Owl v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988). "Courts must not 'rubber stamp the agency decision as correct' … the reviewing court … must engage in a 'substantial inquiry' into the facts, one that is 'searching and careful.'" *Id*. (cit. omitted).

Here, the CDFI Fund explanation offered "runs counter to the evidence before the agency" which is a plain violation of the APA.

- Defendant applied the 80% modifier twice with respect to identifying loans issued to low-income target populations, in essence changing the definition of low-income from 80% of median family income to 64%;
- Defendant's claim borrowers provided conflicting information about whether they were Hispanic is objectively and demonstrably false. The "conflicts" in racial data provided were not actually conflicting because the data related to unique individual borrowers not required to have the same ethnic identity as co-borrowers;
- Defendant disqualified IA loans that qualified as Target Market loans for multiple reasons, and ignored designations in the data that made clear many of the loans they excluded qualified as both an IA loan and as an LITP loan; and

- Defendant ignored its own published guidance in attempting to require IA loans to be limited to certain restricted geographical areas, when PPC transactions (those excluded by Defendant) do not need to be located in a CDFI approved Target Market.

Moreover, Defendant's arbitrary and capricious decertification decision implicates basic principles of due process under the 5th Amendment. By failing to give Change sufficient notice and an opportunity to be heard on its erroneous determinations, significant property interests are being impaired, including the interests Change's customers have in their residential purchase agreements and the possible loss of earnest money deposits. In fact, the CDFI Fund doesn't even have an established appeals process or policies and procedures to govern its examinations.

Each of the above errors could have been easily explained and demonstrated to Defendant had it afforded Change notice of its determination and an opportunity to respond. Defendant errors can still be corrected during the pendency of a TRO in advance of a preliminary injunction hearing.

**B. <u>Plaintiff and Its Customers Will Suffer Irreparable Harm.</u>**

A plaintiff seeking a temporary injunction must show more than the "possibility" of irreparable injury; he must demonstrate that irreparable injury is "likely" in the absence of preliminary relief. *See Sato v. U.S. Bank Tr. NA*, 2014 WL 12571041, at *2 (C.D. Cal. Jan. 21, 2014). The claimed harm must be both irreparable and imminent. *See Sato*, supra at *2 (citing *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) "A plaintiff must do more than merely allege imminent harm ...; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." See, *Sato*, supra at *2-3. Plaintiff must make this showing by adducing probative evidence. *Am. Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985).

Here, the irreparable harm is both substantial and imminent, to both borrowers and to Change, all of whom will suffer irreparable harm in the absence of issuance of an ***immediate*** TRO. This is not merely speculative, as hundreds of borrowers will be impacted,

as will Change. For example, one impacted borrower is currently living in a hotel with all of her belongings in a U-Haul truck because she sold her old home and cannot move into her new home because Change cannot fund her loan. Nickel Decl., ¶ 63. Another borrower is similarly impacted because his loan needs to close immediately as he is moving from California to Texas to take care of elderly parents who need close supervision. The borrower leased out his California home effective 9/1/23 and had to vacate the premises, yet has nowhere to live if the new home purchase in Texas does not close by that date (which also impacts the sellers who are expecting to use purchase proceeds to pay for their new lease starting 9/1/23). Nickel Decl., ¶ 64; Exh. 28. Numerous other borrowers will be homeless if their loans do not close. Nickel Decl., ¶ 65; Exhs. 29-31. And Change's administrative team has already received information that approximately $350,000 in earnest money deposits are about to be lost on loans that have already been impacted. Nickel Decl., ¶ 62.

Approximately ***100 loans*** worth approximately ***$50 million*** are scheduled to close ***in the next two weeks***. Nickel Decl., ¶ 57. This places these borrowers at risk of losing millions of dollars in earnest money deposits put up to secure purchase transactions. *Id*. Failure to fund these loans will result in irreparable harm to Change's customers and Change's goodwill. All told, Change will be unable fund approximately ***700 loans*** through October 2023 that were underwritten as CDFI Non-QM or community loans worth over ***$550 million***. *Id*.

Each of these borrowers are real people who have entered into real purchase transactions to purchase a home. In many instances failure to fund the loans will subject these borrowers to the risk of forfeiting their earnest money deposits that are a standard feature of residential purchase agreements. Nickel Decl., ¶ 61. In many instances, these earnest money deposits are the life savings of low-income borrowers from traditionally underserviced communities and cannot be replenished. *Id*. Additionally, failure to fund may deprive the borrower of the ability to purchase the selected home. *Id*. And even for those borrowers who may not lose a deposit and may be able to qualify for loans using traditional underwriting criteria, they will still likely lose the benefit of rate locks they had secured in an ever-increasing interest rate environment. *Id*.

Further, Defendant's failure to provide sufficient notice, or to afford an opportunity to cure, or to otherwise follow its own established guidelines, are all violations of Change's basic due process rights. The "deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

**C. <u>The Balance of Equities Tips in Plaintiff's Favor and is in the Public Interest.</u>**

Plaintiff must demonstrate that "the balance of equities tips in his favor" and that "an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) "These factors-merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In assessing these factors, the Court must "balance the competing claims of injury and must; consider the effect on each party of the granting or withholding of the requested relief," as well as "the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24..

Here, Change and its customers will suffer irrevocable harm if the injunction is not issued. Defendant's decision will impose catastrophic consequences on vulnerable borrowers who need CDFI programs and their bespoke underwriting requirements to qualify for home loans and will lose earnest money deposits and important contractual rights if Change is unable to fund their loans.

Conversely, Defendant will suffer no harm whatsoever if the injunction is granted. CDFI Certification does not cost the government anything. The government is not guaranteeing, buying or exposed to any risks associated with the loans. Moreover, Change currently does not participate in any of the CDFI's programs and does not get any grants, tax benefits, financing or other capital from the CDFI Fund. Nickel Decl., ¶ 3. Thus, the granting of the TRO will not cause any impact to Defendant or its budget. Granting the injunction will afford Defendant additional time to review Change's response to its findings and to correct any erroneous determinations.

Such an injunction also serves the public interest. Defendant describes itself as

follows at https://www.cdfifund.gov/, as mission driven to support economic growth and opportunity for distressed communities and the economically disadvantaged.

Here, the parties agree; specifically, CDFIs play a critical role in servicing consumers who are traditionally underserviced. These borrowers, by definition are not served by Banks, so the imminent harm is even greater and their ability to mitigate it is generally, non-existent. Change is the largest CDFI lender in the country. Injunctive relief will allow Change an opportunity to respond and Defendant a meaningful opportunity to review Change's response to ensure that the marketplace of underserviced consumers will not lose access to desperately needed capital, their savings in the form of forfeited deposits, or homes.

## IV. A BOND SHOULD NOT BE REQUIRED.

Although FRCP 65(c) requires the applicant of injunctive relief to post a bond prior to the issuance of the injunction, the Ninth Circuit has confirmed the district court has wide "discretion as to the amount of the security required, ***if any***." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). "The district court may dispense with the filing of the bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id*. Here, there is no realistic likelihood that Defendants will be harmed from the issuance of a temporary restraining order and a preliminary injunction. Defendants offered no explanation as to why the Decertification Notice was issued without affording Change any opportunity to respond, and enjoining the decertification pending further review to correct the numerous errors is Defendant's analysis will impose no financial or operational harm to Defendant.

///

///

///

///

///

///

## V. CONCLUSION.

For the reasons set forth above, Plaintiff respectfully requests this Court issue a temporary restraining order enjoining its notice of revocation pending further consideration of the issue at a preliminary injunction hearing 60 days from the issuance of the TRO.

Dated: August 30, 2023

**MICHELMAN & ROBINSON, LLP**

By: /s/ *Marc R. Jacobs*

Mona Z. Hanna, Esq.
Sanford L. Michelman, Esq.
Marc R. Jacobs, Esq.
Jesse J. Contreras, Esq.
Attorneys for Plaintiff
CHANGE LENDING, LLC

**Certification of Compliance with L.R. 11-6.2**

The undersigned, counsel of record for Plaintiff Rescue 1 Financial, LLC, certifies that this brief contains 6,994 words, which complies with the word limit of L.R. 11-6.1.

*/s/ Marc R. Jacobs*
Marc R. Jacobs