SANFORD L. MICHELMAN (SBN 179702)_
smichelman@mrllp.com
MARC R. JACOBS (SBN 185924)
mjacobs@mrllp.com
JESSE J. CONTRERAS (SBN 190538)
jcontreras@mrllp.com
**MICHELMAN & ROBINSON, LLP**
10880 Wilshire Boulevard, 19th Floor
Los Angeles, CA  90024
Telephone:   (310) 299-5500
Facsimile:    (310) 299-5600

MONA Z. HANNA (SBN 131439)
mhanna@mrllp.com
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, Suite 1000
Irvine, CA 92614
Telephone:   (714) 557-7990
Facsimile:    (714) 557-7991

Attorneys for Plaintiff
CHANGE LENDING, LLC.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHANGE LENDING, LLC,<br><br>            Plaintiff,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF TREASURY, COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS FUND<br><br>            Defendant. | Case No.: 8:23-cv-01626<br><br>**DECLARATION OF THEDORA NICKEL IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>*[Filed concurrently with herewith: (1) Plaintiff's Complaint; (2) Plaintiff's Ex Parte Application for Temporary Restraining Order to Show Cause Why A Preliminary Injunction Should Not Issue (3) Declaration of Marc R. Jacobs; and (4) [Proposed] Temporary Restraining Order and Order to Show Cause]* |

## DECLARATION OF THEDORA NICKEL

I, Thedora Nickel, hereby declare, under penalty of perjury, as follows:

1.     I am currently, and have at all relevant times been, the Executive Director of Plaintiff Change Lending, LLC ("Change"). The facts set forth below are based on my personal knowledge and if properly called to testify as a witness, I could and would competently testify thereto. I am over the age of eighteen and am authorized to submit this declaration on behalf of Change Lending, LLC in support of Change Lending, LLC's Ex Parte Application for a Temporary Restraining Order.

2.     In May 2018, Change's Certification Application was granted by CDFI Fund, thereby certifying Change as a CDFI. Since receiving its CDFI certification, Change has provided $6.8 billion in lending to low-moderate income borrowers; $1.3 billion in lending to persistent poverty areas; and $3.1 billion in lending to First Time Homeowners. These loans go to the very heart of Change's mission of ensuring all people and communities have access to necessary investment capital and financial services, expanding economic opportunity for underserved communities by participating in a national network of community development lenders, investors, and financial service providers.

3.     Change's CDFI certification allows Change to provide loans to those in underserved communities across the country, making homeownership a reality for diverse and underserved families. The certification does this by affording Change increased flexibility in underwriting, helping Change level the playing field through providing access to fair and responsible lending and remove barriers that prevent underserved borrowers from achieving homeownership. This is done with proprietary products, streamlined processes, and strategic partnerships with capital sources.

4.     Change is a CDFI lender and serves communities in 47 states with 40 branches and over 2,600 lending partners, servicing and providing loans to economically disadvantaged communities by injecting new sources of capital into neighborhoods that lack access to financing, and to low-income, minority, and socially-economically divers

1

1  marginalized borrowers. Change offers both traditional and non-traditional loans to all
2  communities.

3       5.     The Treasury Department's CDFI Fund supports financial institutions that
4  serve low-income and historically underserved individuals and communities. Institutions
5  seeking support from the CDFI Fund must apply for and receive CDFI certification in order
6  to become eligible. 12 C.F.R. § 1805.200(a). To become certified as a CDFI, an institution
7  must, among other regulatory criteria, serve a "Target Market." *Id.* § 1805.201(b)(3). An
8  applicant may show that it serves a Target Market by demonstrating in its application that it
9  provides financial products or services to at least one (a) "Investment Area," or (b) "Targeted
10 Population." *Id.* § 1805.201(b)(3)(i).

11      6.     To become certified, the CDFI Fund requires, among other things, that an
12 applicant direct at least sixty percent (60%) of its financial product activities to a Target
13 Market. There are two ways for a CDFI institution to show they meet the 60% requirement.
14 The first is by demonstrating that at least 60% of financial product activities are directed to
15 borrowers (or members) residing in "Investment Areas," which are geographically defined
16 areas designated by the CDFI Fund at the census tract level based on indicators of economic
17 distress. The second is by demonstrating that at least 60% of financial product activities are
18 directed to one or more "Targeted Populations," which may include one or more Low Income
19 Targeted Populations ("LITPs") (defined based on income) or Other Targeted Populations
20 ("OTPs") (which are usually persons who self-identify as being a member of a historically
21 disadvantaged ethnic group).

22      7.     Change currently meets and has always met the certification requirements of 12
23 C.F.R. § 1805.201. Upon request, Change has always cooperated with and provided full
24 documentation to the CDFI Fund that proves this compliance upon request.

25      8.     On December 13 and 14, 2021, the CDFI Fund conducted an onsite examination
26 that Change believed went well. The Office of Certification and Policy Evaluation ("OCPE")
27 staff and Change worked hand-in-hand reviewing loans and the OCPE staff used the same

28

**DECLARATION OF THEODORA NICKEL IN SUPPORT OF PLAINTIFF'S EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER TO SHOW CAUSE WHY A
PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

methodology as Change for testing loans. Change's policies, procedures, accountability, and other important aspects of the company were all reviewed. OCPE's staff discussed national IA and OTP-Disabled for 2021. At the on-site exam the CDFI Fund reviewed actual borrower files and all loan determinations by the CDFI Fund matched Change's loan designations with respect to Target Market qualification.

9.      But then, in an April 14, 2022 email, the CDFI Fund staff requested all financial year 2020 and 2021 loan level data. A true and correct copy of the CDFI Fund's April 14, 2022 email is attached hereto as **Exhibit 1**. Despite the significant undertaking, Change submitted the report in a timely manner.

10.      Then, on August 31, 2022, the CDFI Fund issued its first Compliance Report, which found, among other things, that the certified CDFI's combined IA, LITP, and OTP transactions represented an estimated 41% of transactions in 2020 and 45% in 2021; and estimated 33% of transaction dollar amounts in 2020 and 32% in 2021. In making the above finding with respect to LITP, the CDFI Fund used the share of Low-Income persons based on the Department of Housing and Urban Development (HUD) ACS 5-Year 2011-2015 Low- and Moderate-Income Summary Data was used at the block-group level and aggregated to census tracts to match Change Lending transactions using the 11-digit census tract code. A share of 70% Low-Income persons per census tract was used as the threshold for the analysis. Similarly, in making the above finding with respect to OTP transactions, the CDFI Fund rejected any loan to a Black borrower who did not live in a 70% Black community, and rejected loans to Hispanic borrowers who did not live in a community comprised of 70% Hispanics. ***Neither of these methodologies were proper***. A true and correct copy of the August 31, 2022 report is attached hereto as **Exhibit 2**.

11.      On September 6 and 14, 2022, Change responded, requesting clarification of the methodologies implemented by the CDFI Fund in the CDFI Fund's August 31, 2022 findings. A true and correct copy of Change's September 6, 2022 response is attached hereto

**DECLARATION OF THEDORA NICKEL IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

1  as **Exhibit 3**. A true and correct copy of Change's September 14, 2022 response is attached

2  hereto as **Exhibit 18**.

3       12.    On October 11, 2022, the CDFI Fund responded, providing a detailed

4  clarification of the methodology used by Financial Strategies & Research ("FS&R") staff in

5  creating their initial analysis in the cite visit notification dated August 31, 2022.  In this

6  approach, the CDFI Fund used the share of Low-Income persons based on the Department

7  of Housing and Urban Development ("HUD") ACS 5-Year 2011-2015 Low-and Moderate-

8  Income Summary Data was used at the block-group level and aggregated to census tracts to

9  match Change Lending transactions using the 11-digit census tract code. A share of 70%

10  Low-Income persons per census tract was used as the threshold for the analysis. If a census

11  tract's composition of Low-Income persons was 70% or higher, then any transaction located

12  in that census tract was classified as LITP by FS&R staff. Otherwise, a transaction was

13  classified as "Not LITP." The CDFI Fund then proceeded to state that because Change

14  Lending is only approved for OTP-African American and OTP-Hispanic categories as part

15  of their Target Market, the FS&R staff revised their initial analysis, separating the OTP

16  categories from each other and restricting FS&R's analysis to African American and

17  Hispanic populations only. The CDFI Fund continued on to state that under this revised

18  methodology, if the composition of a census tract's population was 70% or higher for

19  African-American, then any transaction located in that census tract was classified as OTP-

20  African American by FS&R staff. Otherwise, a transaction was classified as "Not OTP-

21  African American." If the composition of a census tract's population was 70% or higher for

22  Hispanic, then any transaction located in that census tract was classified as OTP-Hispanic

23  by FS&R staff. Otherwise, a transaction was classified as "Not OTP-Hispanic." Further,

24  under this revised methodology, the underwriters income data field provided by Change was

25  used to verify against the income thresholds in the CDFI Fund Investment Area data file.

26  Thus, for loans classified as LITP by Change, the FS&R staff looked at the underwriter's

27  income value provided by Change to determine whether an income fell below the income

28

threshold. If the value was below the income threshold, then FS&R staff classified the transaction as "LITP." If the value was above the income threshold, then FS&R staff classified the value as "Not LITP." No adjustment for family-size was addressed or assessed in these calculations. A true and correct copy of the CDFI Fund's October 11, 2022 response is attached hereto as **Exhibit 4**.[1]

13.     Then, on November 2, 2022, the CDFI Fund sent Change the *CDFI Certified Cure – Frequently Asked Questions 2022*. Question 11 asked "What assessment methodologies are NOT allowed to determine if a CDFI's activity has been Target Market–directed for CDFI Certification purposes?" To which the CDFI Fund responded: "The standard CDFI Certification-related Target Market verification processes ***do not currently allow any geography proxy*** to be used to determine if a Financial Product transaction can be counted as Low- Income Targeted Population-directed or Other Targeted Population-directed." A true and correct copy of the CDFI Fund's FAQs 2022 is attached hereto as **Exhibit 5**.

14.     Upon review of the FAQs, Change intended to seek further clarification regarding Question 11 and the methodologies the CDFI Fund previously described to Change, including whether the CDFI Fund agrees that the FS&R approach is a "geographic proxy?". The CDFI Fund agreed to discuss this matter over the phone. But on November 3, CDFI Fund canceled the call. A true and correct copy of Change's November 2, 2022 correspondence is attached hereto as **Exhibit 12**.

15.     On December 7, 2022, CDFI Fund published a proposed Preapproved Target Market Methodologies that mirror those employed by Change, but have been repeatedly rejected by the CDFI Fund when applied to Change. A true and correct copy of the Proposed Pre-Approved Target Market Methodologies is attached hereto as **Exhibit 6**.

---

[1] The attached correspondence is dated October 6, 2022, but was sent to Change October 11, 2022.

5

16.     Change responded, explaining that Change has provided undisputable evidence that FS&R staff used a geographic proxy of greater than 70% OTP threshold in determining if a borrower is African American or Hispanic, despite the fact the CDFI Fund's regulations prohibit such a proxy. Change continued on to express concerns that FS&R staff's analysis is unlawful and contrary to the CDFI Fund's policies – therefore it is unjust for the CDFI Fund to uphold the FS&R staff's finding that implemented these methods. A true and correct copy of Change's December 8, 2022 communication is attached hereto as **Exhibit 7**.

17.     On December 9, 2022, the CDFI Fund responded to Change's concerns, abandoning the previous improper analysis implemented by FS&R staff, and instead proposed *another* verification analysis "using a different methodology." A true and correct copy of the CDFI Fund's December 9, 2022 response is attached hereto as **Exhibit 8**.

18.     Then, on February 17, 2023, after conducting a *second* assessment using the publicly available HMDA Modified Loan/Application Register ("LAR") from the Consumer Financial Protection Bureau to assess the accuracy of Change Lending's OTP designation on transactions in 2020 and 2021, the CDFI Fund confirms Change met the qualifications for 2021, but indicated that it could not confirm the dollar amount threshold for 2020. The CDFI Fund stated Change did not meet the qualifications for 2020 because Change failed to accurately account for income and family size. A true and correct copy of the CDFI Fund's February 17, 2023 communication is attached hereto as **Exhibit 9**.

19.     On March 8, 2023, Change responded to CDFI Fund's contention that it had not properly accounted for income and family size by pointing out that none of the data provided addressed income and family size and therefore CDFI Fund had no basis upon which to assert Change had not properly accounted for those factors. Change further expressed concern that CDFI Fund may have again used some form of improper or illegal proxy for income and family size to substantiate its claim. A true and correct copy of Change's March 8, 2023 response is attached hereto as **Exhibit 10**.

20.     On March 29, 2023, the CDFI Fund once again abandoned its previous findings, conceding ***it does not actually know the family size for 2020***, and therefore cannot conclusively determine whether Change complied. In fact, the CDFI Fund admits that its revised analysis suggests that Change met the 60% threshold for 2021. The CDFI Fund then requested Change's year-to-date data as a "cure" for the "issue" identified in the August 31, 2022correspondence. Change complied with this request, despite the fact there was nothing to "cure" as the CDFI Fund found no conclusive deficiencies and had no finding from a prior year that it had not withdrawn or disclaim, as admitted in the CDFI's March 29 correspondence. The CDFI Fund continued on to (1) direct Change to submit a new Target Market Modification request; (2) inform Change that 2011-2015 ACS Eligible Investment Area data will be used to verify eligible census tracts for Investment Area-purposes (despite the fact the CDFI Fund formally authorized 2016-2020 ACS data for 2023); and (3) decline to grant Change's Target Market Modification requests for OTP-People with disabilities, when the CDFI Fund has been conducting classes on OTP-Disabled and has OPT-Disabled included in its Proposed Preapproved Target Market Methodologies.  A true and correct copy of the CDFI Fund's March 30, 2023 response is attached hereto as **Exhibit 11**. A true and correct copy of the CDFI Fund's Proposed Preapproved Target Market Methodologies is attached hereto as **Exhibit 6**.

21.     On April 12, 2023, Change once again requested a call to clarify the CDFI Fund's requests. A true and correct copy of Change's April 12, 2023 communication is attached hereto as **Exhibit 13**.

22.      On April 14, 2023, the CDFI Fund denied Change's phone call request until Change provides a list of questions in advance of the call. A true and correct copy of the CDFI Fund's April 14, 2023 response is attached hereto as **Exhibit 14**.

23.     On April 19, 2023, Change provided a list of questions and concerns. These questions sought clarification on, among other things, why Change must submit a Target Market Modification, whether submitting the requested information would cure all findings,

and what "findings" the CDFI Fund wanted Change to Cure. A true and correct copy of the Change's April 19, 2023 communication is attached hereto as **Exhibit 15**.[2]

24.     Change then submitted cure data even though the CDFI Fund failed to respond to Change's questions or participate in a call.

25.     Change then provided updated data in its ordinary course of business as the CDFI Fund sought mid-year numbers. This update showed that Change had another $8 million in LITP loans, per the IRS tax transcripts.

26.     On August 15, 2023, the CDFI Fund stated it was not done with its review of Change, and that Change would hear back regarding the outcome later in the week.

27.     Then, on August 17, 2023, the CDFI Fund sent Change an email notifying Change that the CDFI Fund had terminated Change's CDFI certification. The Decertification Notice stated that, "Since the CDFI Fund has determined that Change does not meet or exceed the 60 percent requirement in both number of transactions and dollar amount of transactions, Change's CDFI Certification status will be terminated as of the date of this notification." This letter was the first time the CDFI Fund identified any "anomalies" in Change's 2023 data. The CDFI Fund stated these "anomalies" supported its finding that Change had failed to meet its 60% target market threshold in dollar amount of loans issued. Change had no advance notice of this termination and was not afforded any appeal process or opportunity to cure. A true and correct copy of the CDFI Fund's August 17, 2023 Decertification Notice is attached hereto as **Exhibit 16**. Specifically, the CDFI Fund found that Change reached 66.42% in terms of loan count but only reached 57.78% in terms of dollar amount. This finding and the Decertification Notice thereafter were based on the CDFI Fund's analysis of 2023 year-to-date data that it had requested from Change on March 29, 2023.

[2] The document was inadvertently mis-dated. April 19, 2023 is the correct date of the correspondence.

8

28.     The CDFI Fund did not afford Change the opportunity or time to respond prior to sending the letter, and Change expected the decision would be tolled pending response, rebuttal or appeal.

29.     On August 18, 2023, Change responded to the Decertification Notice, outlining the mathematical and clerical errors made by the CDFI Fund in erroneously concluding Change failed to meet the 60% threshold (as detailed further below). A true and correct copy of Change's August 18, 2023 letter is attached hereto as **Exhibit 19**.[3] Over the next week and a half, Change continued its attempts to resolve this dispute as quickly and amicably as possible through communications with the CDFI Fund.

30.     On August 21, 2023, Change, through counsel, requested a phone call to discuss a resolution. A true and correct copy of Change's August 21, 2023 letter is attached hereto as **Exhibit 20.**

31.     On August 22, 2023, the CDFI Fund confirmed receipt of Change's "service request" through the CDFI Fund's Award Management Information System ("AMIS") but provided no avenue for further discussion. The communication confirmed the Office of Compliance Monitoring and Evaluation ("OCME") would be reviewing Change's August 18 letter, which Change understood to mean that the CDFI Fund would conduct a good faith review of the response to the Decertification Notice. A true and correct copy of the CDFI Fund's August 22, 2023 communication and AMIS portal is attached hereto as **Exhibit 21**.

32.     But, on August 23, 2023, while Change was working to minimize the impact to its borrowers, the CDFI Fund published a document that was dated August 22, 2023 that claimed Change Lending was not a CDFI as of August 15, 2023.  Change has no idea how the August 15, 2023 date is accurate, as it has emails from the CDFI Fund of that date stating that no decision or response was ready.  While the list was not ***published*** until August 23, the list itself is labeled as CDFIs "as of August 15, 2023." Thus, while the Decertification

---

[3] The document was inadvertently mis-dated. August 18, 2023 is the correct date of the correspondence.

9

Notice states certification was terminated August 17, the CDFI Fund publicly represented that Change was decertified no later than August 15, 2023. A true and correct copy of the CDFI Fund's August 22, 2023 list is attached hereto as **Exhibit 32**. The CDFI Fund's delay in notifying Change has harmed not only Change, but Change's borrowers, as detailed below.

33.     As a result, CDFI's lenders froze their accounts for Change's programs.

34.     On August 23, 2023, Change requested an update, emphasizing the importance of a timely resolution. A true and correct copy of Change's August 23, 2023 email is attached hereto as **Exhibit 22**.

35.     On August 23, 2023, the CDFI Fund, through OCPE Manager Michelle Dickens, once again confirmed receipt of Change's correspondence, simply stating the CDFI Fund would respond to Change "next week" with no further information. A true and correct copy of the CDFI Fund's August 23, 2023 email is attached hereto as **Exhibit 23**.

36.     Change quickly followed up on August 23, 2023, requesting the CDFI Fund confirm the decertification was on hold while the parties reach a resolution to prevent further harm to borrowers. The CDFI Fund has not responded. A true and correct copy of the Change's second August 23, 2023 email is attached hereto as **Exhibit 24**.

37.     On August 25, 2023, Change once again requested confirmation of the suspension of the decertification, but was met with an out-of-office automated response, stating Dickens was out of the office until August 29, but would respond upon her return. A true and correct copy of Change's August 25, 2023 email is attached hereto as **Exhibit 25**. A true and correct copy of the CDFI Fund's August 25, 2023 email is attached hereto as **Exhibit 26**.

38.     Change was expecting the CDFI Fund to make itself available for a meeting by no later than Tuesday, August 29, 2023, to conduct a good faith review to correct the obvious errors in the CDFI Fund's decertification analysis or, at a minimum, to confirm suspension

**DECLARATION OF THEDORA NICKEL IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

1   of the improvident decertification pending a further review of the errors identified by

2   Change. Instead, the CDFI Fund once again avoided Change's good faith meeting attempts.

3       39.    Change now realizes that, despite multiple attempts and its best efforts to

4   resolve this dispute informally, Court intervention is required to protect Change's borrowers,

5   as the CDFI Fund has continued to evade and delay Change's resolution attempts.

6   Throughout the CDFI Fund's delays, Change's lenders have frozen the funds designated as

7   CDFI loans. The funds will remain frozen until Change is re-certified.

8       40.    The CDFI Fund's determination was based on excluding over 180 loans worth

9   in excess of $63 million that Change had correctly determined were Target Market loans.

10  The exclusion of these loans was based on internal errors made by the CDFI Fund.

11      41.    First, in making this determination, the CDFI Fund erroneously removed 73

12  loans with a loan value of $30,413,981 from Change's target market calculations for the

13  following reason:

14          "Loans tagged as 'LITP' for 'Qualifying Target Market' data
15          field have a share of income adjusted for family size greater than
            80 percent when Change's 'Annual Family Income' data field
16          was divided by Change's 'MFIAdjustedforFamilySize' data
17          filed."

18      42.    "LITP" means "low-income target population." Qualifying LITP loans go the

19  heart of the CDFI program by serving low-income populations and loans made to low-

20  income borrowers. A low-income borrower is a borrower that earned only 80% of the median

21  family income, which is then further adjusted to reflect the borrower's family side. LITP

22  loans count towards a CDFI's 60% loan portfolio target threshold.

23      43.    The CDFI Fund's disqualification of these loans is based a mathematical error

24  made by the CDFI Fund. In the spreadsheet provided to the CDFI Fund, it is clear that the

25  MFIAdjustedforFamilySize field (column AI) was a calculation field that multiplied the

26  applicable census tract MFI (column AF) by 0.8 to reflect 80% of MFI (column AG) which

11

1  was then adjusted by family size to derive MFIAdjustedforFamilySize (column AI). Thus,

2  Change had already performed the 80% calculation prior to sending the data to the CDFI

3  Fund. All the CDFI Fund needed to do was compare "Annual Family Income" against

4  "MFIAdjustedforFamilySize" to ensure "Annual Family Income" was the lower number. If

5  it had done so, it would be clear that these 74 loans qualify as LITP loans.

6      44.    Instead of doing the above, the CDFI Fund applied the 80% factor a second

7  time – consequently changing the definition of a low-income borrower to one who eared

8  64% or less of MFI, rather than the statutorily defined 80%.

9      45.    Second, in making this determination, the CDFI Fund erroneously removed 19

10 loans with a loan value of $7,464,464 from Change's target market calculations for the

11 following reason:

12         "Loans categorized as 'Hispanic' for the 'Qualifying Target
13         Market' data field that have conflicting information in their
           'BorrowerEthnicity,' 'Borrower2Ethnicity,'
14         'Borrower3Ethnicity,' 'CoBorrowerEthnicity,'
           CoBorrower2Ethnicity,' and/or 'CoBorrower3Ethnicity' data
15         fields."

16

17     46.    These loans are made to assist underserviced target populations and are targeted

18 to "Other Target Populations" or "OTPs." OTP loans count towards a CDFI's 60% loan

19 portfolio target threshold. One identified OTP is borrowers who self-identify as "Hispanic."

20 A loan qualifies as an OTP loan if at least 50% of the borrowers on a loan self-identify as

21 "Hispanic."

22     47.    The CDFI Fund's disqualification of these loans was based on a CDFI Fund's

23 misunderstanding of the data. The CDFI Fund disqualified loans if there was any conflict

24 between a Borrower Ethnicity and CoBorrower Ethnicity in the provided spreadsheet. For

25 instance, if "BorrowerEthnicity" for a loan was reported as "Hispanic" but

26 "Borrower2Ethnicity" for the same loan was reported as "White," Defendant disqualified

27 the loan for exhibiting a conflict in the way borrower identified their ethnicity.

28

**DECLARATION OF THEDORA NICKEL IN SUPPORT OF PLAINTIFF'S EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER TO SHOW CAUSE WHY A
PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

48.     The CDFI's Fund's reading of this data does not account for the fact that "BorrowerEthnicity" and "Borrower2Ethnicity" represents the ethnicity of two distinct and separate borrowers. It is factually impossible for there to be a conflict between "BorrowerEthnicity" and "Borrower2Ethnicity" because each Borrow and CoBorrower is a unique individual with a unique social security number.

49.     CDFI loans may have up to six borrowers and/or co-borrowers and depending on the relationship of said borrowers, they may fill out multiple applications in support of a loan. A loan may be supported by up to three distinct applications.

50.     Third, the CDFI Fund erroneously removed 96 loans with a loan value of $25,235,022 from Change's target market calculations for the following reason:

> "Loans tagged as 'IA' for the 'Qualifying Target Market' data filed are located in (1) states for which Change does not have an approved IA TM; (2) census tracts that do not qualify as Ias according to CDFI Funds's publicly available list of Ias; and (3) census tracts that do not exist on CDFI Fund's publicly available 2016-2020 ACS list of census tracts."

51.     Loans tagged as "IA" refers to "Investment Areas." These loans assist borrowers in purchasing homes or financing business in historically low-income geographic areas. These loans can be used to establish a CDFI's 60% loan portfolio target threshold.

52.     Investment Areas are defined at 12 C.F.R. §1805.201(b)(3)(ii) as a geographic unit (or contiguous geographic units), such as a census tract, located within the United States, that meets at least one of the following criteria:  Has a population poverty rate of at least 20%; has an unemployment rate 1.5 times the national average; for a Metropolitan area has a median family income (MFI) at or below 80% of the greater of either the Metropolitan or national Metropolitan MFI; for a Non-Metropolitan area that has an MFI at or below 80% of the greater of either the statewide or national Non Metropolitan MFI; is wholly located within an Empowerment Zone or Enterprise Community; or has a county population loss greater than or equal to 10% between the two most recent census periods for Metro areas or

**DECLARATION OF THEDORA NICKEL IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

5% over last five years for Non-Metro areas. For Non-Metropolitan counties, the criteria is the same as census tracts.

53.     On March 21, 2023, the CDFI Fund issued its 2016–2020 American Community Survey (ACS) Data Frequently Asked Questions – Community Development Financial Institution Investment Area and Bank Enterprise Award Program Transition (the "FAQ"). In the FAQ, the CDFI stated the Persistent Poverty Counties ("PPCs") (which satisfy the IA requirement that the IA "has a population poverty rate of at least 20%") was updated by Congress in December 2022 through Public Law Number 117-328 (enacted 12/29/2022). This law was applicable to 2023 originations by CDFIs and defined PPCs as follows:

> "any county, including county equivalent areas in Puerto Rico, that has had 20% or more of its population living in poverty over the past 30 years, as measured by the 1990 and 2000 decennial censuses and the 2016–2020 5-year data series available from the American Community Survey of the Bureau of the Census or any other territory or possession of the United States that has had 20% or more of its population living in poverty over the past 30 years, as measured by the 1990, 2000 and 2010 Island Areas Decennial Censuses, or equivalent data, of the Bureau of the Census."

The CDFI Fund FAQ also informed the public that "PPC transactions do not need to be located in their approved Target Market but must be in an Eligible Market and a PPC County." A true and correct copy of the CDFI Fund's 2016–2020 FAQ is attached hereto as **Exhibit 17**.

54.     Under this definition, Change is entitled to classify as Target Market loans all loans in Persistent Poverty Counties. Further, "PPC transactions do not need to be located in [a CDFIs] approved Target Market but must be in an Eligible Market and a PPC County." All 96 of these at issue loans are located in an Eligible Market and PPC County. Therefore, the CDFI Fund should not have excluded IA loans that are not approved in the ten states

14

1  Change has received an IA Target Market certification to serve as this methodology is

2  inconsistent with the CDFI Fund's own FAQ public guidance. Rather, the CDFI Fund should

3  include all PPC loans nationwide towards Change's Target Market numbers.

4      55.    The inclusion of these loans in Change's denominator, rather than numerator

5  when calculating the Tarket Market Percentage lowers Change's percentage, essentially

6  punishing Change for lending to PPC and LITP nationally.

7      56.    Further, many of the loans removed on this basis qualified as Target Market

8  loans for multiple reasons. For loans that qualified under multiple Target Market metrics,

9  Change assigned the loan to a single Target Market to ensure there was no double counting

10 of the loans and therefore should be counted towards Change's 60% regardless of the above.

11 For example, loans that qualify as both LITP and IA were designated IA **only** for purposes

12 of calculation but are independently qualified based on LITP. The data provided by Change

13 to the CDFI Fund has columns reflecting each Target Market and whether each loan qualified

14 under each Target Market for the sake of completeness. Yet the CDFI Fund did not account

15 for this data.

16     57.    This wrongful termination of Change's certification will cause Change to be

17 unable to fund up to 700 loans through October 2023 that were underwritten as CDFI non-

18 QM or community loans. These loans are worth over $550 million and are to largely low-

19 income and minority borrowers and will impact hundreds of borrowers. Most of these loans

20 are home purchase loans. Further, in the next two weeks alone, approximately 100 loans

21 worth more than $50 million are scheduled to close.

22     58.    Change cannot presently fund these loans because they were underwritten and

23 approved using underwriting criteria that does not comply with ATR because Change had

24 previously been exempt from the ATR requirements imposed on non-CDFI loans. Failure to

25 ensure compliance with ATR would violate standard provisions in Change's warehouse

26 lending agreements and would make the loans impossible to sell, which deprives Change of

27 any realistic way of facilitating the loan. These loans can no longer proceed as CDFI loans

28

if Change is not CDFI certified, and therefore cannot be issued until borrowers submit new applications, adjusted using traditional underwriting criteria that many of Change's borrowers will be unable to satisfy. Therefore, without its certification, Change can no longer fund the inventory of Community loans it has already approved through October. Further, approximately half of Change's non-QM loan inventory is impacted by decertification. This is particularly troubling because non-QM loans, or a non-qualified mortgage, is a specific type of mortgage that allows an individual to qualify for a mortgage based on alternative methods rather than income verification, as is required for most loans. Common examples include bank statement or an individual using assets as income.

59. Even if Chance *could* disregard the ATR requirements (it cannot), Change can no longer fund CDFI loans. After the CDFI Fund's August 17, 2023 Decertification Notice, Change believed that the CDFI Fund was reviewing the issues and that the decertification was uncertain until the review was complete. However, Change's banks require certainty and therefore are threatening to shut down Change's financing.

60. For instance, on August 29, 2023, multiple funding sources advised Change that they will no longer fund loans until Change clarifies its certification status. Now, because of the CDFI Fund's continued delays and avoidances, Change is unable to confirm that Change's CDFI certification status is active pending review. Change has been forced to suspend all funding of impacted loans as of August 29, 2023.

61. Most of these borrowers will be unable to fund their home purchase and therefore risk losing earnest money deposits and real estate deposits, (standard features of residential purchase agreements), the rates they locked for the mortgages, and the ability to enforce their purchase agreements, risking the loss of the ability to purchase their selected home. Even if a borrower is qualified for loans under traditional lending criteria, the borrower will still be harmed because their loans will not be able to close pursuant to timetables dictated by in-place real estate agreements which likely will result in forfeited deposits and a loss of the borrower's ability to enforce their agreement to purchase.

16

Additionally, even for those borrowers who may not lose a deposit and may be able to qualify for loans using traditional underwriting criteria, they will still likely lose the benefit of rate locks they had secured in an ever-increasing interest rate environment. Further, many of these borrowers put down their life savings as a deposit and are now at risk of losing it. The CDFI Fund's decertification of Change places these borrowers at risk of losing millions of dollars in earnest money deposits used to secure the purchase transactions. Each of the impacted borrowers is an individual who entered a real purchase transaction with the hopes of purchasing a home.

62.     Further, Change has been informed that approximately $350,000 in earnest money deposits, as well as other deposits due at the removal of contingencies are about to be lost on loans that have already been impacted.

63.     Additionally, one of Change's impacted borrowers has been forced to move into a hotel room, with all her belongings in a U-Haul truck, because Change is unable to fund her loan for her new home. In reliance on Change's funding, she sold her home. But, because Change is no longer able to fund her loan, she has been stranded. A true and correct copy of an August 23, 2023 email regarding this borrower is attached hereto as **Exhibit 27**.

64.     Similarly, another borrower, who is moving from California to Texas to take care of his elderly parents, who are in poor health and in need of supervision, is imminently at risk of losing his new residence. This borrower executed a lease for their California residence with new tenants starting September 1, 2023, requiring the borrower to vacate the property. But, without the loan from Change, the borrower is at risk of losing his new property in Texas and being left with nowhere to go. A true and correct copy of an August 23, 2023 email regarding this borrower is attached hereto as **Exhibit 28**.

65.     These borrowers are not alone. Countless other borrowers are imminently at risk of losing necessary funding to obtain housing. These borrowers include single mothers (**Exhibit 29**), borrowers with multiple dependents, including their elderly parents *and* children (**Exhibit 30**), and generally borrowers in all walks of life (**Exhibit 31**). A true and

17

1  correct copy of an August 23, 2023 email regarding this borrower is attached hereto as
2  Exhibit 29. A true and correct copy of an August 23, 2023 email regarding this borrower is
3  attached hereto as Exhibit 30. A true and correct copy of an August 23, 2023 email regarding
4  these borrowers is attached hereto as Exhibit 31. Each day Change is unable to fund these
5  loans, these borrowers and others will be impacted.

6          I declare under penalty and perjury that the foregoing is true and correct. Executed
7  on this 30th day of August 2022, in Yorba Linda, California.

8
9                                                                Thedora Nickel
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28